66   26
127  534

66   26
130  479

66   26
142  372

66   26
190  ⁸533

# Andrew M. Wiley *et ux.*

*v.*

# Clementius Ewalt *et al.*

1.  SUFFICIENCY OF PROOF TO SET ASIDE DEED, *on ground of undue influence.* On bill to set aside a deed made by an aged person, in the nature of a testamentary disposition, on the ground of undue influence and want of sufficient mental capacity, the proof failed to show that any one made any suggestions to the grantor as to what disposition should be made of the property, or that he did not, of his own volition, select the persons who should be the recipients of his bounty, and the several persons charged with having influenced his action denied, under oath, that they ever advised him to make such disposition of his property, and this was not overcome by any evidence in the record: *Held*, that the charge of undue influence was not sustained by the proof.

2.  MENTAL CAPACITY *to make a disposition of property.* Where a deed, made by a party in the nature of a testamentary disposition, giving the bulk of his remaining property to his four daughters after his death, was sought to be set aside by a portion of his heirs, on the ground that his mind had become impaired by reason of his advanced age and by the use of intoxicating liquors, it appeared, from the evidence, that the deed was made at the age of seventy-six years, just on the eve of his second marriage, and that at that time his memory only was somewhat impaired, but that he still possessed a sound, practical judgment in business matters; and it further appeared that he had exhibited judgment in making the disposition of his property, by reserving to himself the absolute control of the same during his life, and that he had previously given his other children property, while the four daughters had got but little, so that the disposition was not very unequal; and it further appeared that he was then a vigorous man for his age, and that the disposition was not made from any sudden impulse, but in pursuance of a purpose formed to that effect many years before: *Held*, that the facts would not justify a decree setting aside the deed.

3.  In order to justify the setting aside of a deed where no undue influence is shown, on the ground of mental incapacity from age, it must be shown that the grantor was affected with such a degree of mental weakness as to render him incapable of understanding and protecting his own interests. The circumstance that his mental powers had been somewhat impaired by age, is not sufficient, if he still retained a full comprehension of the meaning, design and effect of his acts.

APPEAL from the Circuit Court of Peoria county; the Hon. SABIN D. PUTERBAUGH, Judge, presiding.

Messrs. JOHNSON & HOPKINS, for the appellants.

Messrs. O'BRIEN & HARMON, and Mr. H. W. WELLS, for the appellees.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

This bill was to set aside a deed of trust executed by John Ewalt, in his lifetime, to David R. Gregory, as trustee for four of his daughters, viz: Mary, Susan, Lucy and Harriet, and for partition of lands described in the deed among his heirs, which was all the real estate he owned at the time of his death.

The land conveyed for the use of his four daughters named, as well as a tract intended for his son William, was ratably charged with a payment of $500 to his daughter Martha, and with the payment of the annual sum of $100 to his widow during her natural life, should she survive him.

The deed was executed on the 24th of January, 1861, on the eve of his second marriage. By the terms of the deed, he was to retain the exclusive possession and control of the lands until his death, and then the same were to be divided equally between the four daughters named, except one tract, which was to be conveyed to his son William. He continued to reside on the lands with his second wife until April, 1869, when he died, at the advanced age of eighty-four years.

In support of the bill, it is alleged when the deed was made Ewalt was old and childish, easily influenced and incompetent to transact business; that Wiley, Hurff and Kidder, who were his sons-in-law and husbands of three of the beneficiaries named in the deed, took advantage of the confidence reposed in them to procure its execution; that it was done for the double purpose of depriving the other heirs of their just share of the estate, and his widow of her dower, and of getting it themselves.

On the other hand, it is insisted that he executed the deed of his own free will, without the use of any fraudulent practices; that he was then a vigorous man, and in the possession of all his faculties, unimpaired, except what might be expected of one so far advanced in life, and that the transaction was in the nature of a testamentary disposition of his property, in fulfilment of a purpose formed many years previous.

The testimony of a cloud of witnesses has been taken in support of the respective theories advanced. It is by far too voluminous to be discussed in detail, and we can only state our conclusions, drawn from a careful consideration of the entire evidence.

The persons charged with having been guilty of misconduct in procuring the execution of the deed are Wiley, Kidder and Hurff. It very clearly appears, from the evidence of Kidder, who is now willing the deed shall be set aside, that he did not know of the intention of Ewalt to execute such a deed; was not present, and, until some time afterwards, had no knowledge of its execution. Hurff was not present at the execution of the deed. It is in evidence, however, that, in a conversation about his second marriage soon to take place, he advised Ewalt that he ought to make a contract with the woman he was about to marry, that she should take so much money annually, in lieu of dower, in case she should survive him. This was the first suggestion that was ever made to him on the subject. After a moment's reflection, he said he would do it, and expressed satisfaction for the advice.

In a few days after this conversation with Mr. Hurff, Ewalt called at the house of appellant Andrew Wiley. He was then on his way to Peoria to be married. Wiley asked him if he was going to encumber his property with another woman, and he replied, "No." Nothing was said at that time about the disposition that was to be made of the property. There is no evidence in the record that shows Wiley had ever had any previous conversation with him on the subject. He

invited Wiley to go to Peoria with him, without stating for what purpose. It was agreed that Wiley should meet him there next morning at a certain hotel. They met according to agreement, went together to the office of Johnson & Hopkins, and Mr. Ewalt, for the first time, so far as this evidence shows, disclosed to Wiley what disposition he intended to make of his property. The deed was drawn up under his direction by one of the attorneys. It was acknowledged and given to Wiley, who took it to the proper office to be filed for record. On the same day, after the deed was executed, he was married, and the parties returned to their respective homes.

It does not appear that any one made any suggestions to him as to what disposition should be made of the property. So far as the evidence discloses, he selected, of his own volition, the persons who should be the recipients of his bounty. Every one charged in the bill with having procured the making of the deed by undue influence, deny, under oath, that they advised any such disposition of the property, and there is no evidence to the contrary in the record. Neither Kidder nor Hurff had any knowledge that any disposition whatever was to be made of the property until after it was done.

The suggestion to make an ante-nuptial contract that would cut off the widow's right of dower, came from Hurff, and not from Wiley. It would be singular indeed if Hurff advised the making of the deed that would debar his wife from her inheritance in a valuable estate for the trifling sum of $500, which was all she would get under its provisions.

It is not now insisted that that part of the bill which charges Kidder and Hurff with having exerted an undue influence over the grantor to produce the making of the deed has been maintained by the proof, and if Wiley did it, the record is singularly barren of evidence to establish that fact. The more important inquiry in the case is, whether Ewalt was

mentally competent to make the deed, or indeed any disposition whatever of his property. The ground relied on to invalidate the transaction is that his mind had become impaired by reason of his advanced age and by the excessive use of intoxicating liquors.

The evidence affords a minute history of the deceased from the time of his arrival in this State, in the fall of 1830, to the date of his death, which occurred in the spring of 1869. It gives a vivid picture of his life, exhibiting his physical, mental and social qualities. While the proof shows the better characteristics of his nature, his children, who were witnesses in the cause, have not withheld his defects, the recollection of which ought to have been permitted to die with him. His character has been portrayed as he lived and acted in his family, and among his neighbors, through an extended period of eighty-four years. One witness, himself eighty-four years old, when he was testifying, gives his history from early life. He was a man of extraordinary physical powers, of great industry and energy of character. His mind was not highly cultivated, but he possessed a sound, practical judgment, and, as one of the witnesses expresses it, he had a "mind of his own." Coming to the State poor, by his own industry and the assistance of his children, he soon acquired property that laid the foundation for a very valuable estate. Like all successful men in life, he possessed great will; was passionate, and sometimes violent, but withal a kind man and just, when his passion subsided. He was sometimes harsh, but would easily relent, and was devotedly attached to all his children. When temporarily estranged from any of them, which not unfrequently happened, he was easily influenced to be reconciled. Three of his daughters, on account of his violent opposition, had to leave the paternal home to be married, yet he always afterwards treated them and their husbands with affectionate regard. Although unfriendly with his son Clementius for a short period before his death, he was always devotedly attached to him, and among the last words

of his life that the testimony reproduces, were those invoking the divine blessing to rest upon him.

The evidence exhibits in him many inconsistent traits of character. He was self-willed and obstinate, and yet kind and affectionate. Addicted, through all his life, to the rather excessive use of intoxicating liquors, his family physician never discovered that it impaired his faculties. Some of his neighbors thought it did, but others were equally positive it did not.

In later life, his memory began to fail, and, as an evidence of such fact, it is related of him that he repeated over many times the adventurous exploits of his early life to the same persons. There was nothing unusual in this. It was, however, the most marked defect in his mind made to appear. He still possessed a sound, practical judgment in all business matters. It is true, his mind, at the age of seventy-six, was not as vigorous as it had formerly been. When he executed the deed that disposed of his property to his children, he had the good sense to retain in himself, so long as he should live, the absolute control. He was not guilty of the insane folly of many, in conveying his property to his children and taking back an obligation for his maintenance.

It may be fairly stated, as a conclusion from the whole evidence, that, at the date of the execution of the deed and his second marriage, he was a vigorous man, for one of his age, and in the possession of all the faculties of his mind not very much impaired, except his memory. That had failed very much, but he still remembered, with great distinctness, the events of half a century ago. At that age, he read but little; and while he had a clear comprehension of passing events to which his attention was directed, they soon faded from his recollection; yet it would be unjust to his memory to say that he was imbecile. Notwithstanding some of his faculties, especially his sight and memory, had failed in a great degree, his judgment and sense of justice, when brought into exercise, were as strong as in the days of his greatest

strength and activity. His will was by no means impaired. In opposition to the wishes of all his family, and especially of his daughters, he entered into the marriage relation a second time, at the age of seventy-six years.

In *Lindsey* v. *Lindsey*, 50 Ill. 79, on a bill filed by one of several heirs to set aside a deed made by his father to one of the other children, upon the ground of the mental imbecility of the grantor and of undue influence, it was held that to entitle the complainant to the relief sought, there being no undue influence shown, he must show such a degree of mental weakness as renders a party incapable of understanding and protecting his own interests. The circumstance that the mental powers have been somewhat impaired by age, is not sufficient if the contracting party still retains a full comprehension of the meaning, design and effect of his acts.

The case of *Clearwater et al.* v. *Kimler*, 43 Ill. 272, in many respects like the one at bar, announces the same general principles.

In this case, the transaction may be regarded as in the nature of a testamentary disposition of his property, to take effect at the death of the grantor. It was not done from any sudden impulse, but, according to the testimony of Mrs. Kidder, one of the beneficiaries named, it was in pursuance of a purpose formed many years ago. She states that her father said that he had done more for his sons than he would be able to do for his girls, and that he intended the remainder of his lands for them. The evidence shows that the daughters named in the deed had received from their father only a few articles of personal property of trifling value, and the sons had been very liberally assisted by him to land and other property. The division of the property, as made by the deed among his children, was not so unequal as to shock our sense of justice. The fact that it was done in fulfilment of a purpose formed long before, relieves it greatly from the imputation that it was procured by undue influence of interested parties. A man has the right to dispose of his property as he chooses,

and if he gives one child more than another, that fact affords no just ground of complaint.

We fail to discover anything in the entire record that would authorize a court to set aside the deed of the 24th of of January, 1861, and divide the property as intestate estate among the several heirs.

The decree of the circuit court will be reversed and the bill dismissed.

*Decree reversed.*